UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MICHAEL J. PRIEMER,

   Plaintiff,

                Case No. 10-cv-12969

v.

                Paul D. Borman

INTERNATIONAL AUTOMOTIVE    United States District Judge
COMPONENTS,

   Defendant.
_____/

**OPINION AND ORDER**
**GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (Dkt. No. 37)**

  This is an employment discrimination case arising under the Age Discrimination in Employment Act ("ADEA") of 1967, 29 U.S.C. §§ 621, *et seq.* Michael J. Priemer ("Plaintiff") filed the Complaint against International Automotive Components ("IAC" or "Defendant") on July 27, 2010. (Dkt. No. 1.) On April 26, 2011, Plaintiff filed a Motion for Leave to File First Amended Complaint, attaching as an exhibit a proposed First Amended Complaint. (Dkt. No. 17.) The First Amended Complaint alleged that Defendant violated the ADEA and the Elliott-Larsen Civil Rights Act by selecting Plaintiff for layoff and failing to rehire him. Although Plaintiff's motion to amend was granted on June 21, 2011 (Dkt. No. 22), Plaintiff did not file the First Amended Complaint.

  On April 30, 2013, Defendant filed a motion for summary judgment. (Dkt. No. 37.) This motion and its exhibits were stricken on May 1, 2013, when Defendant filed a Corrected Motion for Summary Judgment. (Dkt. No. 43.) Plaintiff filed a response on June 13, 2013. (Dkt. No. 50.) Defendant filed a reply on July 8, 2013. (Dkt. No. 56.) The Court held a hearing on August 29, 2013.

1

For the reasons stated below, the Court will GRANT Defendant's Corrected Motion for Summary Judgment.

## I. BACKGROUND

Plaintiff was born on September 9, 1949. In approximately 1985, Plaintiff began working as a wood model maker in the automotive industry. Plaintiff was initially employed by Textron Corporation. Textron Corporation was later sold to Collins & Aikman ("C&A"), after which Plaintiff became a C&A employee. In September of 2007, Defendant IAC purchased C&A. Plaintiff, like all C&A employees in his department, was required to apply for a position with IAC. On August 23, 2007, Plaintiff was offered the position of Technician I for the Product Engineering Department at IAC.

Plaintiff was the oldest employee in the Prototype and Validation Department at C&A and, later, IAC. In a December 6, 2007 evaluation, Plaintiff wrote, "[b]eing one of the older employees, I am not looking for added responsibilities." (Def.'s Mot. for Summ. J., Ex. 1, Priemer Dep., Ex. 3, Salaried Performance Evaluation.) Plaintiff testified at his deposition that he "wasn't looking to become a leader. . . . I didn't want that type or responsibility as far as listening to other people's problems. I enjoy working. Not only that, I've been a leader before. I enjoy -- I did that type -- the responsibility that goes along with it, I felt that I didn't want it at that particular time." (Priemer Dep. 64.)

Initially, Plaintiff's job involved making models of car parts out of wood for prototype purposes. Gradually, the industry began shifting from wood models to using computer-aided design ("CAD") models. William Hoisington, the former manager of C&A's Prototype and Validation Department, testified as follows:

2

> Q. Just to educate me, how do CAD designers compare or contrast to model makers such as Mr. Priemer was at one time?
> A. It would be data that we had -- well, Mike's model making days, typically the designers were not CAD, they were manual draftsmen.
> Q. Okay.
> A. So this was when the industry was kind of making that transition into CAD and instead of using wooden models, they had machines that actually cut tools straight from CAD data.
> Q. Okay.
> A. So the model making piece was eliminated.
> . . . .
> Q. Is that a trans -- is that a transition that has been completed in the industry?
> A. Yes.
> Q. When was that, if you can assign a particular date or time frame to it?
> A. My best guess would be still in the '90s.

(Def.'s Mot. for Summ. J., Ex. 4, Hoisington Dep. 11.)

As the automotive industry transitioned away from model making, the work in the Prototype and Validation Department became less specialized. Ramior "Ray" Hernandez, who worked as a Shop Floor Leader at C&A, testified that "[u]p to 2008, yeah, we lost a lot of that work, a lot of the detail stuff we're doing. We're not doing that anymore. We're doing a bu[n]ch of grinding parts and repetitious stuff." (Def.'s Mot. for Summ. J., Ex. 3, Hernandez Dep. 71.) Hernandez further testified that "basically you can walk anybody off the street right now and they can do what we [are] doing with minimal training." (Hernandez Dep. 72.) With regard to model making, Hernandez testified: "[w]e're not doing any of that tool making anymore, no models anymore. Nobody is doing that that I know of." (Hernandez Dep. 94.) Hernandez testified that, instead of creating the tools and components from wood, the automotive components now arrive at the shop already finished, and the employees merely assemble them to certain specifications.

3

> Q. So today there's still some mockup work being done. Mostly it comes to you as a finished product to be put together?
> A. Correct.
> Q. All right. And to the extent that something doesn't fit together, does that ever happen?
> A. All the time.
> Q. Okay. What do you do then?
> A. You tell the engineers and the engineers have to change the tools or whatever they have to do.

(Hernandez Dep. 95.)

After C&A was purchased by IAC, James Eickhoff was hired to manage the Prototype and Validation Department. In April 2008, the Senior Vice President of Engineering, Maurice Sessel, directed Eickhoff to reduce his workforce by 10 percent. Because Eickhoff managed approximately 30 employees in the Prototype and Validation Department, he was responsible for eliminating three positions. Eickhoff testified that he was given a week to make the decision and no directions about whom to select.

Eickhoff testified that one position was eliminated by combining the roles of a manager and supervisor in the Prototype and Validation Department. This required Eickhoff to have to choose whether to retain the supervisor, Preston Gordon, or manager, Joe Fehir. Eickhoff decided to retain Joe Fehir because "he had more practical skills and he may have managed labs previously, so when we looked at the two, Joe seemed to be the better fit to manage the validation engineers and the -- and the test center." (Def.'s Mot. for Summ. J., Ex. 2, Eickhoff Dep. 48.) Fehir, who was retained, was approximately 57 in April 2008, which was five years older than Gordon, who was laid off.

Eickhoff gave a detailed explanation of the process for selecting the next two individuals for layoff at his deposition:

> A. We went -- well, then I[] got with Tom Yates and Joe Fehir, and we sat down, and we had a challenge to get two more

4

>   people, and we went through the different disciplines and work load. The work load did not reduce, we had the same amount of work to do, but we had to do it with less people, so when -- we started with the engineers, we had to cover all of those programs with validation engineers, it was a specific skill set, so we elected not to cut any of the engineers.
> Q. Okay.
> A. Then we moved on to technicians, and then we went -- we had the advanced engineering technicians, we had the lab technicians, and then we had the prototype technicians.
>
>   . . . .
> A. So we looked at -- at the lab technicians.
> Q. And those were who?
> A. They were Shawn Shailer, David Lindsey, Rod Kage, and Charles Duff.
> Q. Okay.
> A. And they were the -- they were the technicians that operated the test equipment and helped develop test reports.
> Q. Okay.
> A. So there was a definite skill set there that we couldn't -- couldn't deplete.

(Eickhoff Dep. 51-52.)

Eickhoff testified that the employees classified as "advanced engineers" had the skills to program the laser sintering equipment. (Eickhoff Dep. 53-54.) Eickhoff then looked at the employees classified as "prototype engineers," which included Plaintiff.

> A. So that -- brought us down to four people, and when we looked at Ray Hernandez and Mike Carrier and Mike Priemer and Chris [Gignac], we looked at the skill sets, we looked at their approach to work, and when we look at the -- the efficiency on -- on -- on how they performed, we -- because we had to do less with more -- or more with less people, I needed -- I needed the flexibility.
>   I could move the other technicians if -- if the work load in the assembly group grew, I could move those other technicians to do the assembly, but when it came down to the last four people, Ray Hernandez, and Mike Carrier were stronger and more efficient, and we decided to keep them.

(Eickhoff Dep. 56.)

5

Eickhoff conceded that he had not directly supervised Plaintiff, and that the decision to eliminate Plaintiff was therefore partly based on information Eickhoff had received from Tom Yates, who "basically, had six months, more or less, experience with Mike, and the people in -- in the prototype lab." (Eickhoff Dep. 74.) Eickhoff further testified that he also relied on "previous conversations with Bill Hoisington when we're talking about the skill sets or abilities or a -- the performance of people." (Eickhoff Dep. 74.) Eickhoff stated that his decision ultimately hinged on Plaintiff's overall skill sets: "Mike was very, very methodical in his approach to his jobs and . . . we didn't need the methodical skill sets of a model maker, we needed to [have] somebody to get the assemblies put together." (Eickhoff Dep. 76.) Tom Yates similarly testified that Plaintiff was selected for layoff because his skills as a wood model maker were no longer necessary. (Def.'s Mot. for Summ. J., Ex. 5, Yates Dep. 50.)

Hernandez testified that Plaintiff and Chris Gignac were some of the best technicians in the department: "those were, like, the, you know, go-to guys for all the stuff. They w[ere], like, supposed to be meticulous and stuff." (Hernandez Dep. 25.) However, Hernandez also testified at his deposition that the Prototype and Validation Department no longer did the type of work that Plaintiff used to do: "Not anymore. Not anymore. All we do is just screw parts together. A lot of the -- more intricate stuff that we used to do we don't do that work anymore." (Hernandez Dep. 55.) The unskilled assembly work that Plaintiff previously performed at IAC is now handled by contract laborers, who are hired as needed. (Yates Dep. 82.)

Plaintiff was laid off on April 30, 2008. Plaintiff testified that after he was laid off, he learned that a younger employee, Joe Denver, was doing the work that Plaintiff had previously done. However, Plaintiff also testified that Denver was not a new employee, and that he had previously

6

worked with Denver prior to being laid off.

Plaintiff testified that while he was employed by IAC, he frequently heard one of his supervisors, Fred Caswell, make age-based comments. Caswell was the only employee that Plaintiff heard make age-based comments. Caswell's employment with IAC was terminated some time after Plaintiff was laid off.

Plaintiff testified that he "strongly feel[s]" that Eickhoff was the person that made the layoff decisions. (Priemer Dep. 61.) Eickhoff testified that he only received information from Tom Yates prior to making the decision to layoff Plaintiff. Yates testified that he could not recall receiving an opinion about Plaintiff's work performance from Fred Caswell. However, Caswell was one of the individuals who gave Yates feedback regarding the performance of the employees doing assembly, like Plaintiff. Hernandez, who was also involved in submitting employee evaluations to Yates, stated that he "thought everybody did a good job[,]" and that he "had no problems with Mike [Priemer]." (Hernandez Dep. 24.)

After his layoff, Plaintiff contacted a recruiter about an engineering job. Plaintiff testified that the recruiter "was very happy to get my resume and she felt very positive about talking to me and reading my resume that I may be able to fill this position." (Priemer Dep. 55.) When Plaintiff first contacted the recruiter, the recruiter did not reveal the name of the company that had posted the job. However, in subsequent conversations, Plaintiff learned that the company was Defendant IAC, and that the supervisor for the position was William Hoisington. Plaintiff was not hired for the engineering job.

Plaintiff alleges that his layoff was based on his age. Plaintiff also alleges that Defendant refused to rehire him despite his qualifications based on his age. Now before the Court is

Defendant's Corrected Motion for Summary Judgment.

## II. LEGAL STANDARD

A party opposing a motion for summary judgment bears the burden of establishing that there is a genuine issue of material fact that must be decided by a jury. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The Court construes all reasonable inferences in favor of the non-moving party. *Id*. at 587. In opposing a motion for summary judgment, a party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Id*. at 586. The dispute over a material fact must be "'genuine,' that is, if the evidence is such that a reasonable juror could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## III. ANALYSIS

In his Brief in Opposition to Defendant's Motion for Summary Judgment, Plaintiff states that he is proceeding only on his ADEA claim based on his layoff, and that he is withdrawing his failure to rehire claim and his claims under the Elliott-Larsen Civil Rights Act. (Pl.'s Br. in Opp. to Def.'s Mot. for Summy. J. at 1 n.1.) The Court will therefore dismiss Plaintiff's ADEA claim based on Defendant's refusal to rehire him and Plaintiff's claims under the Elliott-Larsen Civil Rights Act.

**A.**

Defendant first argues that Plaintiff's claims are untimely pursuant to a contractually shortened limitations period set forth in Plaintiff's employment application. The relevant provision states:

> I further agree not to bring any action or suit relating directly or indirectly to my employment with IAC, or the termination of such employment, more than 6 months after the date or termination of such employment and I waive any statute of limitations to the contrary. If

> this provision is held invalid or unenforceable, I agree that such time
> period will be increased to the minimum extent necessary to make
> such provision valid and enforceable.

(Priemer Dep., Ex. 1, Application for Employment.)

The Michigan Supreme Court has held "that an unambiguous contractual provision providing for a shortened period of limitations is to be enforced as written unless the provision would violate law or public policy." *Rory v. Continental Ins. Co.*, 473 Mich. 457, 470 (2005). The United States Court of Appeals for the Sixth Circuit has previously held as enforceable a similar abbreviated limitations period in an application for employment. *See Thurman v. DaimlerChrylser, Inc.*, 397 F.3d 352, 355-59 (6th Cir. 2004) (affirming district court's dismissal of claims brought after the six-month time period for any claims against the employer set forth in employment application).

Other courts in this District have held that, in cases arising under Title VII, a contractually abbreviated limitations period cannot begin until 180 days after the filing of an EEOC charge. *See Fritz v. FinancialEdge Community Credit Union*, 835 F. Supp. 2d 377, 383 (E.D. Mich. 2011) (Ludington, J.); *Lewis v. Harper Hosp.*, 241 F. Supp. 2d 769, 772 (E.D. Mich. 2002) (Duggan, J.); *Brown v. VHS of Michigan, Inc.*, No. 11-15508, 2013 WL 119395, at *3 n. 1 (E.D. Mich. Jan. 9, 2013) (Cleland, J.). This is because "any period of 180 days or less is preempted by the EEOC's period of exclusive jurisdiction and necessarily precludes any judicial consideration of Plaintiff's claim." *Fitz*, 835 F. Supp. 2d at 383.

Defendant asserts that, even if the abbreviated limitations period did not start until after Plaintiff filed his EEOC charge, his claim is still barred, because he waited nearly two years before filing the Complaint in this matter. Plaintiff filed his EEOC charge on October 9, 2008. (Priemer Dep., Ex. 5, EEOC Charge.) However, Plaintiff did not request a right-to-sue letter until

9

approximately April 27, 2010. (Def.'s Mot. for Summ. J., Ex. 9, Meiring Aff.) Plaintiff did not file the Complaint in this matter until July 27, 2010.

Although the EEOC retained exclusive jurisdiction over Plaintiff's ADEA claim after he filed his EEOC charge on October 9, 2008, Plaintiff was entitled to sue 180 days thereafter, in April 2008. The contractually abbreviated limitations period thus began in April 2008, and ended in October 2009. Plaintiff did not file the Complaint in this matter until July 2010. Plaintiff's claims are thus barred pursuant to the contractually abbreviated limitations period.

Plaintiff argues that the statute of limitations should not begin until Plaintiff received his right-to-sue letter. Plaintiff asserts that Defendant's contractual limitations period interferes with the policy behind allowing plaintiffs to pursue an action with the EEOC.

The language at issue in this case provided that, even if the provision was invalid, the limitations period would "be increased to the minimum extent necessary to make such provision valid and enforceable." Plaintiff had, at minimum, 180 days before he could file a complaint in federal court under the ADEA. Under the contractual language in this case, the Court finds that Plaintiff's claims are untimely.

**B.**

The Court also finds summary judgment appropriate because Plaintiff has failed to produce evidence establishing a prima facie case of age discrimination under the ADEA. "To establish a Title VII or an ADEA employment discrimination claim, a plaintiff must present either direct evidence of discrimination, or circumstantial evidence permitting an inference of discriminatory treatment." *Nwabue v. Wayne State Univ. School of Medicine*, 513 F. App'x 551, 553 (6th Cir. 2013). Plaintiff concedes that he has no direct evidence of age discrimination. (Pl.'s Br. in Opp.

to Def.'s Mot. for Summ. J. 21.) "Where, as here, the plaintiff fails to present direct evidence of age discrimination, the claim is analyzed using the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L. Ed. 2d 668 (1973)." *Blizzard v. Marion Technical College*, 698 F.3d 275, 283 (6th Cir. 2012). Under this framework, Plaintiff has the initial burden of making out a prima facie case of age discrimination. *Id.* If Plaintiff does so, "the defendant must articulate some legitimate, nondiscriminatory reason for the termination." *Id.* (internal quotation marks omitted). "Once the defendant meets this burden, the plaintiff must produce sufficient evidence from which the jury may reasonably reject the employer's explanation." *Martin v. Toledo Cardiology Consultants, Inc.*, 548 F.3d 405, 410-11 (6th Cir. 2008).

To establish a prima facie case under the ADEA, a plaintiff must show: "(1) that he or she was age forty or over; (2) that he or she was qualified to perform the job; and (3) that he or she was discharged." *Barnes v. GenCorp Inc.*, 896 F.2d 1457, 1465 (6th Cir. 1990). However, where a plaintiff was discharged in connection with a workforce reduction, as in this case, the Sixth Circuit requires "additional direct, circumstantial, or statistical evidence tending to indicate that the employer singled out the plaintiff for discharge for impermissible reasons." *Id.* Plaintiff does not dispute that he must meet this additional burden.

There is no dispute that Plaintiff was over the age of 40 when he was laid off, that his layoff constituted an adverse employment activity, and that he was qualified to perform the tasks he was performing at the time of his layoff. Defendant contends that Plaintiff cannot establish that he was singled out for discharge for impermissible reasons, i.e., because of his age.

Plaintiff argues that his training, skills, and experience were superior to the other, younger employees who were retained in the Prototype and Validation Department. Specifically, Plaintiff

claims that he was more qualified than Joe Denver, Frank Baretta, Mike Carrier, and Mark Gumowski.

The Sixth Circuit has held that "a plaintiff could establish a prima facie case by showing that he or she possessed qualifications superior to those of a younger co-worker working in the same position as the plaintiff." *Schoonmaker v. Spartan Graphics Leasing, LLC*, 595 F.3d 261, 265 (6th Cir. 2010). In support of his argument, Plaintiff relies on his own deposition testimony and the deposition testimony of Ray Hernandez. However, Plaintiff also testified that he believed the layoff decision was made by Eickhoff, who did not have any discussions with Hernandez prior to making the layoff decisions. Eickhoff also testified that both Mark Gumowski and Frank Baretta were not selected for layoff because they were more flexible; they knew how to program the laser sintering equipment – a skill that Plaintiff lacked – and they could also do the basic assembly work that Plaintiff performed. Eickhoff further testified that Joe Denver was retained because he was the only employee who was properly licensed to drive the delivery truck.

Furthermore, even viewing Hernandez's deposition in a light most favorable to Plaintiff, it does not support Plaintiff's contention that his qualifications were superior to other technicians who were retained. Hernandez stated at his deposition that he "thought everybody did a good job[,]" and that he gave everyone "good evaluations." (Hernandez Dep. 23-24.) Hernandez also stated that Frank Baretta, who was retained, was a "go-to guy," like Plaintiff and Chris Gignac. (Hernandez Dep. 25-26.) Hernandez testified that Mike Carrier, another employee who was retained, "was pretty good too. . . . A pretty good guy." (Hernandez Dep. 31.) Hernandez further stated that Carrier "likes to take his time doing his work, but he does very good work. I can't say he doesn't do good work." (Hernandez Dep. 51.)

12

Plaintiff's own subjective testimony that he was more qualified than other technicians who were retained is insufficient to establish a prima facie case of discrimination. *See Schoonmaker*, 595 F.3d at 268-69 (holding that, "[w]hile she disagrees with Spartan Graphics's conclusions, Schoonmaker has offered no evidence to support her subjective belief that she is more qualified or productive than Taylor. Schoonmaker's subjective views in relation to other coworkers, without more, are insufficient to establish discrimination."). Taking the evidence in a light most favorable to Plaintiff, a reasonable juror could not find that Plaintiff's qualifications were superior to any retained employees.

Plaintiff next argues that he was discriminated against because he was "replaced" by a younger technician. Plaintiff testified that, after he was laid off, Joe Denver began doing the work that Plaintiff had previously done. Plaintiff admitted at his deposition that Denver was not hired to replace Plaintiff, and that Denver had been working in the Prototype and Validation Department for several years prior to Plaintiff's layoff.

Plaintiff has not shown that he was "replaced" by a younger employee. "A person is replaced only when another employee is hired or reassigned to perform the plaintiff's duties." *Barnes*, 896 F.2d at 1465. Ray Hernandez testified that the department no longer gets the work that Plaintiff used to do. Eickhoff testified that the workload for the department did not decrease after the reductions; the work was simply redistributed among the remaining technicians. Plaintiff has not produced any evidence, aside from his own subjective belief, that Denver was reassigned to perform Plaintiff's duties after his layoff.

Plaintiff argues that "[n]o one other than Hernandez, who had the superior opportunity to observe, can testify to plaintiff's performance based on first-hand observation . . . ." (Pl.'s Resp. in

13

Opp. to Def.'s Mot. for Summ. J. 23.) This argument goes to the weight of the evidence and is not proper in a motion for summary judgment. At this stage, the Court views the entire record, not just the evidence that is favorable to Plaintiff. "Summary judgment will be denied only where *the record as a whole* could lead a rational trier of fact to find for the nonmoving party." *Yellowbook Inc. v. Brandeberry*, 708 F.3d 837, 844 (6th Cir. 2013) (emphasis added).

Plaintiff has also produced statistical evidence purporting to show that Defendant's layoff decisions were not age-neutral. (Pl.'s Resp. in Opp. to Def.'s Mot. for Summ. J., Paranjpe Investigation.)[1] The Paranjpe Investigation compares the distribution of individuals who were retained verse those who were laid off in the Prototype and Validation Department. The Paranjpe Investigation separates the individuals into two groups – those who were over the age of 50 at the time of the terminations, and those who were under the age of 50. In total, 12 individuals were studied, only two of whom were laid off. Both of the employees who were laid off were over the age of 50.

A sampling of only 12 individuals, even when it shows that the two oldest employees were selected for termination, is not statistically significant for purposes of summary judgment in an ADEA case. "A number of courts have recognized that small statistical samples provide little or no probative force to show discrimination." *Simpson v. Midland-Ross Corp.*, 823 F.2d 937, 943 n. 7 (6th Cir. 1987); *see also Schoonmaker*, 595 F.3d at 267 (holding that merely "showing that the two oldest employees were selected for termination" is not sufficient to establish the fourth prong of a prima facie ADEA case, because "such a small statistical sample is not probative of

---

[1] Although attached to Plaintiff's response, the statistical report was not given an exhibit number.

discrimination."); *Tinker v. Sears, Roebuck & Co.*, 127 F.3d 519, 524 (6th Cir. 1997) (affirming district court's decision that statistical evidence did not create an issue of fact, where statistical sample "was only 13 employees, some of whom departed employment with Sears under incentive programs."). Plaintiff's statistical analysis of only 12 employees does not create an issue of fact.

Plaintiff claims that Defendant offered other technicians computer training, but refused to offer him the same training and opportunity for advancement. This allegation is contrary to Plaintiff's earlier statement in his December 2007 performance evaluation, in which he stated "[b]eing one of the older employees, I am not looking for added responsibilities." (Priemer Dep., Ex. 3, Salaried Performance Evaluation.) Plaintiff also claims that he had a commercial drivers' license and could drive a truck, like Joe Denver, but "[n]o one asked" him. (Priemer Decl. ¶ 15.) Again, Plaintiff specifically requested prior to the reduction in force that he was not looking for added responsibilities. Plaintiff cannot now complain that management failed to ask him about his commercial drivers' license, when he requested that he be given no additional responsibility.

In sum, Plaintiff has failed to produce sufficient evidence establishing the fourth element of a prima facie reduction of workforce case under the ADEA. Defendant is therefore entitled to summary judgment on Plaintiff's ADEA claim.

## IV. CONCLUSION

For the reasons stated above, the Court will **GRANT** Defendant's Corrected Motion for Summary Judgment and **DISMISS** the action **WITH PREJUDICE**.

IT IS SO ORDERED.


        s/Paul D. Borman
        PAUL D. BORMAN
        UNITED STATES DISTRICT JUDGE

Dated:  September 3, 2013


### CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on September 3, 2013.

        s/Deborah Tofil
        Case Manager